**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| CARL COGDILL, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :    Civil Action No. 1:24-cv-1422 |
| | : |
| EXPERIAN INFORMATION | : |
| SOLUTIONS, INC; TRANS UNION, LLC, | : |
| EQUIFAX INFORMATION SERVICES, LLC; | : |
| CREDIT MANAGEMENT, LP; | : |
| IC SYSTEM, INC., | : |
| | : |
| Defendants. | : |
| _____ | : |

## COMPLAINT

Plaintiff Carl Cogdill, by counsel, files this Complaint against Defendants Experian Information Solutions, Inc. ("Experian"), Trans Union, LLC ("Trans Union"), and Equifax Information Services, LLC ("Equifax") (collectively, the "CRA Defendants") and Credit Management, LP ("Credit Management"), and IC System, Inc. ("IC System") (collectively, the "Furnisher Defendants," and together with the CRA Defendants, "Defendants"). In support, Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1. Congress enacted the Fair Credit Reporting Act ("FCRA") to protect consumers from the devastating impacts of inaccurate credit reporting. S. Rep. No. 91-517, at 1 (1969) (explaining that the FCRA was intended to "prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report"); *see also Guimond v. Trans Union Credit Info.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (explaining that the FCRA was enacted "to protect consumers from the transmission of inaccurate information about them and to establish

credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner" (citations omitted)).

2.      The statute's express purpose is for "consumer reporting agencies [to] adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. 1681(b).

3.      Even so, inaccurate credit reporting is still a pervasive, long-standing issue for consumers. For example, in 2012, the FTC published a reporting finding that twenty percent of consumers who participated in its study had at least one error on their credit report.[1] Less than ten years later, the situation was even worse: a 2021 study found that more than 34 percent of surveyed consumers could identify at least one error on their credit reports.[2]

4.      One issue that plagues consumers is a "mixed file," which occurs when a consumer's file is mixed with that of another consumer who has similar identifying information.

5.      Here, beginning in at least 2022, Plaintiff noticed information on his credit files that did not belong to him.  MRS BPO had reported a past due debt on Plaintiff's credit reports for amounts allegedly owed to Charter Communications for unreturned equipment.  But Plaintiff had

---

[1] *See* Fed. Trade Comm'n, *Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003*, at 64 (Dec. 2012), https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accuratecredit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf.

[2] *See* Syed Ejaz, Consumer Reports, *A Broken System: How the Credit Reporting System Fails Consumers and What to Do About It* (June 10, 2021), https://advocacy.consumerreports.org/wp-content/uploads/2021/06/A-Broken-System-How-the-Credit-Reporting-System-Fails-Consumers-and-What-to-Do-About-It.pdf.

confirmed with Charter Communications in 2021 that this debt did not belong to him but to someone by the same name living in California.  The account never belonged to Plaintiff.  Indeed, once Plaintiff disputed this debt, MRS BPO acknowledged that the debt did not in fact belong to him and agreed to remove its inaccurate reporting.

6.     But just as MRS BPO acknowledged that Plaintiff did not owe the Charter Communications debt, in August 2023, Plaintiff discovered that Defendant Credit Management, another debt collector, had reported the very same debt on his Experian and Equifax reports.

7.     Adding to Plaintiff's frustrations, in the spring of 2024, Defendant IC System started reporting an alleged debt owed to Pacific Gas & Electric ("PG&E") on Plaintiff's Trans Union and Experian reports.  But Plaintiff did not have any relationship with PG&E, nor did he ever live in California where PG&E provides its services.  This was yet another example of a debt belonging to a different Carl Cogdill in California being reported on Plaintiff's credit file.

8.     Plaintiff repeatedly disputed the Charter Communications and PG&E debts with the CRA Defendants.  However, Experian and Equifax refused to respond to Plaintiff's Charter Communications disputes, forcing Plaintiff to instead wait for Charter Communications to voluntarily instruct Credit Management to cease its inaccurate credit reporting.  And Experian and Trans Union forwarded the PG&E disputes to IC System and simply reiterated the results of IC System's cursory review of its records back to Plaintiff, repeatedly verifying that the PG&E debt belonged to him without any investigation of their own.

9.     As a result of the CRA Defendants' refusal to adopt reasonable procedure to avoid mixing his credit information with others and Defendants' failure to reasonably investigate his disputes, Plaintiff has experienced a significant drop in his credit score, damage to reputation, emotional distress, humiliation, and embarrassment, among other harms.

10.     With the CRA Defendants' refusal to prevent an obvious case of mixed credit reporting, Plaintiff is forced to bring claims against the CRA Defendants for violating the FCRA, §1681e(b), by failing to reasonably ensure the maximum possible accuracy of his credit reports. Plaintiff also alleges claims against the CRA Defendants for violating the FCRA, §1681i, by failing to fully investigate and properly respond to Plaintiff's disputes.

11.     Plaintiff also alleges claims against IC System for violating the FCRA, § 1681s-2(b)(1), by failing to properly investigate his disputes and to review all relevant information provided by the consumer reporting agencies.  And Plaintiff alleges that the Furnisher Defendants violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, by making false representations in the attempted collection of a debt that he did not in fact owe.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction under 28 U.S.C. § 1331, 15 U.S.C. § 168lp, and 15 U.S.C. § 1692k.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District and Division, where Plaintiff resides.

## PARTIES

14.     Plaintiff is a natural person residing in this District and Division and is also a consumer as defined by 15 U.S.C. § 1681a(c) and 15 U.S.C. § 1692a(3).

15.     Trans Union is a foreign limited liability company with a principal place of business in Chicago, Illinois.  Trans Union is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

16.     Equifax is a foreign limited liability company with a principal place of business in Atlanta, Georgia.  Equifax is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

17.     Experian is a foreign corporation with a principal place of business in Orange, California.  Experian is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

18.     Credit Management is a foreign limited partnership with a principal place of business in Dallas, Texas.  It is a "furnisher" as governed by the FCRA.  It is also a "debt collector" as defined by 15 U.S.C. § 1692a(6) because it uses interstate commerce, including mail, to regularly collect or attempt to collect debts from consumers that are owed to another entity, and/or because its principal purpose as a business is the collection of non-performing debts.  Credit Management's website specifically advertises that Credit Management is "a receivables management firm based out of the Dallas-Fort Worth Metroplex," and the website includes a disclaimer that Credit Management is "a debt collector attempting to collect a debt."[3]

19.     IC System is a foreign corporation with a principal place of business in St Paul, Minnesota.  It is a "furnisher" as governed by the FCRA.  It is also a "debt collector" as defined by 15 U.S.C. § 1692a(6) because it uses interstate commerce, including mail, to regularly collect or attempt to collect debts from consumers that are owed to another entity, and/or because its principal purpose as a business is the collection of non-performing debts.  IC System's website specifically advertises that it "is a nationally recognized debt recovery agency," adding that "[f]or 85 years, our debt collection solutions have helped thousands of clients recapture the revenue they're owed."[4]

## FACTS

20.     In 2021, Plaintiff received a call from Charter Communications claiming that he owed $1,043.75 for unreturned equipment.  After spending a long time on the phone with the

---

[3] https://www.creditmanagementonline.com/about-us/ (last visited Aug. 9, 2024).

[4] https://www.icsystem.com/ (last visited Aug. 9, 2024).

Charter Communications representative, Charter Communications determined that the alleged debt did not belong to Plaintiff but to someone with the same name living in California. This could not possibly have been Plaintiff, as he had never lived in California.

21.     Based on the call and Charter Communications' determination that the alleged debt did not belong to him, Plaintiff believed that matter was resolved.

22.     Unbeknownst to Plaintiff, however, Charter Communications referred the debt to MRS BPO for collection.

23.     As part of its debt collection efforts, MRS BPO reported the $1,043.75 Charter Communications account as a past-due debt on Plaintiff's credit files with Equifax and Experian.

24.     After MRS BPO reported the past-due account, in November 2022, Plaintiff received a notification from his bank that his credit score had dropped significantly. He then checked his report and found that his score had dropped because of MRS BPO's reporting.

25.     That same month, Plaintiff wrote a letter to MRS BPO explaining that the debt did not belong to him. He never received a response to this letter, but his credit score returned to near normal, and he believed the issue had been resolved.

26.     Still, in March 2023, Plaintiff received another notification that his credit score had decreased, again because of MRS BPO's false reporting.

27.     Plaintiff once again wrote to MRS BPO to dispute the debt and explain that it did not belong to him. This time, MRS BPO finally responded and acknowledged that the debt was not his. It then removed the debt from Plaintiff's credit files and ceased its debt collection efforts.

28.     Shortly after MRS BPO acknowledged its improper debt collection, in August 2023, Plaintiff received a letter from Revco Solutions about another debt of $4,967 allegedly owed by him, this time for past due amounts owed to Pacific Gas & Electric Company. But Plaintiff

had no relationship with PG&E, nor had he ever lived in California where PG&E operates. Once more, it was a case of mistaken identity with someone by the same name living in California.

29. Indeed, after Plaintiff disputed the debt with Revco, it quickly acknowledged that the debt did not belong to him and ceased its collection efforts.

30. In responding to Revco's letter, Plaintiff pulled his credit report from Equifax and Experian and learned that another debt collector, Defendant Credit Management, was now reporting the same Charter Communications debt that MRS BPO had reported and now acknowledged did not belong to him.

31. Making matters worse, in March 2024, Plaintiff also found that Defendant IC System, yet another debt collector, was now reporting the PG&E debt that did not belong to him on his Experian and Trans Union credit reports.

32. Because of this inaccurate and derogatory reporting, Plaintiff's credit score dropped and his credit files—which previously had no past-due accounts—were now tarnished by false claims that he had not paid his debts. This had a direct and adverse impact on Plaintiff and his family. As just one example, when Plaintiff cosigned for his son's apartment application, the application was rejected due to this decreased credit score. Plaintiff also experienced significant stress, anxiety, embarrassment, and humiliation, as well as damage to his reputation, from the inaccurate and misleading reporting on his credit files and the Furnisher Defendants' debt collection efforts.

### *Plaintiff's Credit Disputes*

33. Over the next few months, Plaintiff sent several disputes to the CRA Defendants regarding the Charter Communications and PG&E accounts reported by Credit Management and IC System.

34.     First, in September 2023, Plaintiff submitted an online dispute with Experian regarding Credit Management's inaccurate reporting of the Charter Communications debt.  Just over two hours after he submitted this dispute, Experian responded that the debt was verified as accurate. Experian did not explain how it reached this conclusion in so short a time, but it was clear that Experian had not properly investigated his dispute.

35.     Then, in November 2023, Plaintiff sent disputes to both Equifax and Experian explaining that the Charter Communications account reported by Credit Management was the result of a mixed identity.  Plaintiff noted that the original debt collector, MRS BPO, had acknowledged this fact.  Plaintiff requested that Equifax and Experian verify the debt and remove the inaccurate and misleading Credit Management reporting.

36.     On or about November 17, 2023, Experian responded to Plaintiff's dispute letter stating that it would not process his dispute because it did not appear to be authorized by him, which was not the case.

37.     On or about November 19, 2023, Equifax responded to Plaintiff's dispute letter and requested additional identification information.  Plaintiff sent this additional identification information to Equifax on December 1, 2023, and asked that Equifax now investigate his dispute. But he never received a response from Equifax.

38.     Then, out of the blue, on November 28, 2023, Plaintiff received a letter directly from Charter Communications stating that it was ceasing all debt collection efforts and credit reporting because of his "identify theft" claim.  But Plaintiff never submitted an identity theft claim.  Indeed, the issue was not identity theft, but a mix-up between himself and a Carl Cogdill residing in California.  In any event, with no help from Equifax or Experian and only upon Charter

Communication's instruction, Credit Management finally ceased reporting the Charter Communications debt on his credit files.

39.     Shortly thereafter, upon learning of the PG&E debt that also did not belong to him, in or around May 2024, Plaintiff mailed dispute letters to Experian and Trans Union regarding the inaccurate reporting.  These disputes explained that the PG&E account did not belong to Plaintiff but that it was a case of mixed identity.  The disputes also requested that Experian and Trans Union try to avoid mixing up Plaintiff's credit file with the credit file of the Carl Cogdill living in California.  And the dispute letters included documents confirming Plaintiff's identity.

40.     Upon information and belief, Experian and Trans Union forwarded these disputes to IC System, who simply reviewed the name on the account page in its system and reaffirmed that the debt belonged to Plaintiff based solely on that information, without considering whether the debt in fact belonged to the Carl Cogdill in Virginia who was disputing the debt.

41.     IC System adopted the same approach in response to a letter sent by Plaintiff in March 2024 asking IC System to verify the debt and explaining that it could not have possibly belonged to him.  As with the credit disputes, IC System responded to this letter and claimed that the PG&E debt belonged to Plaintiff based solely on the name on the account, ignoring the glaring fact that Plaintiff had no other common identifiers with the actual debtor on the account— including absolutely zero connection to California where PG&E exclusively operates.

42.     On or about May 22, 2024, Experian responded to Plaintiff's May 2024 dispute letter.  Experian verified the PG&E account reported by IC System as accurate.

43.     On or about May 23, 2024, Trans Union responded to Plaintiff's May 2024 dispute letter.  Like Experian, Trans Union verified the PG&E account as accurate.

44.     Upon information and belief, Experian and Trans Union relied entirely on IC System's investigation results to verify the account and neglected to conduct any other investigation into Plaintiff's dispute letters.

45.     On or about May 31, 2024, Plaintiff mailed second dispute letters to Equifax and Trans Union disputing the PG&E reporting by IC System.  Plaintiff again explained that this account did not belong to him but another Carl Cogdill living in California.  Plaintiff included his address in Virginia, identification documents, and explained the history of his disputes about the account, including the fact that Revco had ceased its debt collection efforts on the same account after acknowledging that the debt did not belong to him.

46.     In response, on June 11, 2024, Experian once more refused to process Plaintiff's dispute, claiming that it did not appear to be sent by him.  This claim was again false.  Plaintiff was forced to send a follow-up letter on June 18, 2024, resending the dispute and insisting that Experian conduct a reasonable investigation.

47.     Upon information and belief, Experian forwarded Plaintiff's May 2024 and June 2024 disputes to IC System, who conducted the same cursory investigation that, upon information and belief, simply involved a review of the account information page in its internal system and involved no actual investigation into the identity of the debtor and whether it was in fact Plaintiff— a Virginia resident with no connection to PG&E or California.

48.     On or about June 28, 2024, Experian finally responded to Plaintiff's May/June 2024 dispute letter.  Experian again verified the IC System account as accurate.  Upon information and belief, Experian relied entirely on IC System's so-called investigation to verify the account and neglected to conduct any other investigation into Plaintiff's dispute.

49.     Trans Union did not respond to Plaintiff's May 2024 dispute letter.  The disputed information, however, remained on Plaintiff's Trans Union credit report.

50.     Plaintiff sent more dispute letters to Experian and Trans Union in July 2024.   These letters again explained that the PG&E debt did not—and could not possibly—belong to Plaintiff, including because the address associated with the debt was in California at which he had never resided.  Plaintiff also requested that Experian and Trans Union adopt procedures to prevent the association of PG&E accounts belonging to the Carl Cogdill in California with him.

51.     Upon information and belief, Experian and Trans Union forwarded Plaintiff's July 2024 dispute letters to IC System.  Upon information and belief, IC System conducted the same cursory review as it had with Plaintiff's prior disputes.

52.     On July 18, 2024, Experian responded to Plaintiff's July 2024 dispute and again verified the PG&E debt reported by IC System as accurate.  Paradoxically, while allegedly verifying that the PG&E account belonged to Plaintiff, Experian agreed in the same dispute results letter to remove a California address associated with the same Carl Cogdill in California from Plaintiff's list of prior addresses, acknowledging that he had never lived in the state.  This confirms that Experian simply accepted and parroted the results of IC System's cursory review and conducted no reasonable investigation of its own, which would have shown that Plaintiff had no ability to incur a debt with PG&E at a California address.

53.     For its part, Trans Union also repeated back the results of IC System's so-called investigation and again verified the PG&E account without conducting a reasonable investigation of its own.

54.     As a result of Defendants' conduct, Plaintiff has suffered significant actual damages, including, without limitation, credit damage, damage to reputation, embarrassment, humiliation, and other emotional distress.

### Defendants' FCRA Violations Were Willful

55.     The CRA Defendants have substantial notice and knowledge of the "mixed file" problems and failures of their business procedures and systems.

56.     As early as 1992, enforcement action was brought against Experian [formerly TRW, Inc.] in 1991 and 1992 and resulted in consent orders where Experian agreed to maintain reasonable procedures to prevent the occurrence or reoccurrence of mixed files. *See TRW, Inc. v. Morales*, Civ. Action No. 3-91-1340-H (N.D. Tex. 1991); *FTC v. TRW, Inc.*, 784 F. Supp. 361 (N.D. Tex. 1991).

57.     Then, in 2015, the New York Attorney General was forced to sue Experian, Equifax, and Trans Union because of their conduct in mixing consumer credit files. As part of the settlement, Defendants agreed to implement procedures to ensure accurate reporting. https://ag.ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf

58.     Shortly after, the lawsuit resulted in an Agreement of Assurances between Experian, Equifax, Trans Union, and several Attorneys General relating to the CRA Defendants' responsibilities to prevent mixed files. Experian, Equifax, and Trans Union entered into an "Assurance of Voluntary Compliance" to ensure that it would implement changes. http://www.myfloridalegal.com/EC_Edoc.nsf/0/3D93314A8135213B85257E5B00611557/%24file/Equifax+Experian+TransUnion+05-20-2015.pdf

59.     Despite this extensive notice, the CRA Defendants' computer systems still cause mixed files because they do not require or use full identifying information for a potential credit

grantor's inquiry even when unique identifiers such as a full social security number are present. The CRA Defendants do this to sell more credit reports.

60.     Despite their recognition of the mixed file problem, the CRA Defendants knowingly choose to ignore the mixed-file problem, even though they already possess a simple, easy, and inexpensive means to correct and avoid the problem.

61.     Moreover, the CRA Defendants have been sued repeatedly for failing to prevent mixed consumer files. *See, e.g.*, *Miller v. Equifax Info. Servs., LLC*, No. 3:11-cv-1231 (D. Or. 2011) (jury verdict of $18.6 million); *Malverty v. Equifax Info. Servs. LLC*, No. 8:17-cv-1617 (M.D. Fla. 2017); *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996); *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329 (9th Cir. 1995); *O'Conner v. Trans Union Corp.*, Civ. No. 97-4633, 1999 WL 773504 (E.D. Pa. Sept. 29, 1999); *Thomas v. Trans Union*, C.A. No. 00-1150 (D. Or. 2002) (jury verdict of $5.3 million remitted to $1.3 million); *Soghomonian v. Trans Union* (E.D. Cal.)  ($990,000 verdict); *Price v. Trans Union, LLC*, 737 F. Supp. 2d 281 (E.D. Pa. 2010); *Neclerio v. Trans Union, LLC*, Civ. No. 3:11cv1317 (D. Conn. Aug. 17, 2011); *Calderon v. Experian Info. Sols, Inc.*, 2012 U.S. Dist. LEXIS 89375, *10 (D. Idaho 2012); *Howley v. Experian Info. Sols., Inc.*, Civ. No. 09-241 (D.N.J. filed January 16, 2009); *Ainsworth v. Experian Info. Sols., Inc.*, 2011 U.S. Dist. LEXIS 63174 (C.D. Cal. 2011); *Novak v. Experian Info. Sols., Inc.*, 782 F. Supp. 2d 617 (N.D. Ill. 2011); *Comeaux v. Experian Info. Sols.*, 2004 U.S. Dist. LEXIS 10705, *20 (E.D. Tex. 2004); *Cartwright v. Experian*, Civ. No. CV 09-427 (C.D. Cal. 2009); *Campbell v. Experian Info. Sols., Inc.*, 2009 U.S. Dist. LEXIS 106045 (W.D. Mo. Nov. 13, 2009); *Jensen v. Experian Info. Sols., Inc.*, 2001 U.S. Dist. LEXIS 15134 (E.D. Tex. Mar. 30, 2001); *Williams v. Equifax Info. Servs.*, LLC, No. 48-2003-CA-9035-O (Orange County 2007).

62.     Despite these lawsuits and enforcement actions, the CRA Defendants have not altered their procedures to ensure that the credit reports that they prepare, publish, and maintain are as accurate as possible, as required by the FCRA at 15 U.S.C. § 1681e(b).

63.     Upon information and belief, the CRA Defendants have not modified, and do not intend to modify, their procedures to comply with this section of the FCRA because compliance would drastically increase their operating expenses.

64.     As a standard practice, the CRA Defendants also do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the responses of the credit furnishers despite several court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) ("The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230–31 (D. N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

65.     Upon information and belief and consistent with their standard policies and procedures, Experian and Trans Union automatically generated their "investigation" results once IC System verified the PG&E account as belonging to Plaintiff, and they did not take any other actions to verify the accuracy of the information that IC System provided.

66.     Instead, Experian and Trans Union blindly accepted IC System's version of the facts and continued to report the inaccurate, derogatory information on Plaintiff's credit reports.

67.     Experian and Trans Union continue the practice of parroting the furnisher's response despite several lawsuits alleging (and establishing) that they fail to conduct a reasonable investigation under the FCRA.

68.     Experian and Trans Union do not intend to modify their dispute-processing procedures because doing so would drastically increase their operating expenses.

69.     As a result, at all times relevant to this Complaint, the CRA Defendants' conduct was willful and carried out in reckless disregard for a consumer's rights under the FCRA. By example only and without limitation, their conduct was willful because it ran a risk of harm that was known, or so obvious it should have been known, by failing to implement any procedure to identify and correct these common errors before furnishing reports.

70.     IC System's processing of consumer disputes was also willful and carried out in reckless disregard for consumers' rights under the FCRA. For example, IC System's conduct was willful because it was intentionally accomplished through intended procedures that prioritize efficiency over accuracy.

71.     The willfulness of IC System's FCRA violations can be established by, for example:

a.  Congress enacted the FCRA in 1970, and IC System has had over 50 years to become compliant;

b.  IC System is a company with access to legal advice through its own general counsel and outside litigation counsel. Yet there is not contemporaneous evidence that IC System determined that its conduct was lawful;

c.  IC System knew, or had reason to know, that its conduct contradicted the FCRA's plain language, regulatory guidance, and the relevant case law;

d.  IC System voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading of the statute that was merely careless;

e.   IC System's FCRA violations were repeated and systematic;

f.   IC System had substantial documentation available to it that apprised it of its duties under the FCRA but still chose not to comply with the statute; and

g.   IC System had notice of its defective dispute processing procedures through internal audits and litigation but chose not to meaningfully change its policies and procedures to comply with the FCRA.

## COUNT ONE:
### VIOLATION OF FCRA, 15 U.S.C. § 1681e(b)
### (CRA DEFENDANTS)

72.   Plaintiff incorporates the preceding allegations.

73.   The CRA Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained.

74.   Because of the CRA Defendants' conduct, Plaintiff suffered actual damages, including, without limitation, credit damage, damage to reputation, embarrassment, humiliation, and other emotional distress.

75.   The CRA Defendants' conduct in violating § 1681e(b) was willful, rendering them liable to Plaintiff for actual damages, statutory damages, punitive damages, costs, and attorneys' fees under 15 U.S.C. § 1681n. In the alternative, they were negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

## COUNT TWO:
### VIOLATION OF FCRA, 15 U.S.C. § 1681i
### (THE CRA DEFENDANTS)

76.   Plaintiff incorporates the preceding allegations.

77.   The CRA Defendants violated multiple sections of § 1681i, including but not limited to: (1) failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate in violation of § 1681i(a)(1); (2) failing to provide IC System and/or

Credit Management with all the relevant information about Plaintiff's disputes in violation of § 1681i(a)(2); (3) failing to review and consider all relevant information submitted by Plaintiff in violation of §1681i(a)(4); (4) failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation of § 1681i(a)(5)(A).

78.    Because of the CRA Defendants' violations of §1681i, Plaintiff suffered actual damages, including, without limitation, credit damage, damage to reputation, embarrassment, humiliation, and other emotional distress.

79.    The CRA Defendants' violations of § 1681i were willful, rendering them liable to Plaintiff for actual damages, statutory damages, punitive damages, costs, and attorneys' fees under 15 U.S.C. § 1681n. In the alternative, the CRA Defendants were negligent, entitling Plaintiff to a recovery under 15 U.S.C. § 1681o.

## COUNT THREE:
## VIOLATION OF FCRA, 15 U.S.C. § 1681i(a)(6)
## (EQUIFAX AND TRANS UNION)

80.    Plaintiff incorporates the preceding allegations.

81.    As outlined above, Equifax and Trans Union violated 15 U.S.C. § 1681i(a)(6) by failing to provide Plaintiff the results of their reinvestigations after it received his dispute letters.

82.    Because of Equifax's and Trans Union's conduct, Plaintiff suffered actual damages, including the inability to obtain favorable credit, a decreased credit score, damage to reputation, embarrassment, humiliation, and other emotional distress.

83.    Equifax's and Trans Union's conduct was willful, rendering them liable to Plaintiff for actual damages, statutory damages, punitive damages, costs, and attorney's fees under 15 U.S.C. § 1681n.

84.     In the alternative, Equifax's and Trans Union's conduct was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

## COUNT FOUR:
### VIOLATION OF FCRA, 15 U.S.C. § 1681s-2(b)(1)(A)
### (IC SYSTEM)

85.     Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

86.     On one or more occasion within the past two years, by example only and without limitation, IC System violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to properly investigate Plaintiff's disputes.

87.     When Plaintiff disputed the account with the credit reporting agencies, IC System used a dispute system named, "e-Oscar," which is an automated system that the consumer-reporting agencies have developed to quickly transmit disputes to furnishers.

88.     E-Oscar is an automated system, and the procedures used by the credit reporting agencies are systemic and uniform.

89.     E-Oscar's dispute processing is systemic and uniform: when the credit reporting agencies receive consumer disputes, they (usually via an outsourced vendor) translate each dispute into an automated consumer dispute verification ("ACDV") form.

90.     Upon information and belief, the ACDV form is the way IC System has elected to receive consumer disputes pursuant to 15 U.S.C. § 1681i(a).

91.     Upon information and belief, Experian and Trans Union forwarded Plaintiff's disputes via ACDVs to IC System.

92.     IC System understood the nature of Plaintiff's disputes when it received the ACDV forms.

93.     Upon information and belief, when IC System received the ACDV forms containing Plaintiff's disputes, IC System followed a standard and systemically unlawful process where it only reviews its own internal computer screen for the account and repeats back the same information to the ACDV system that was previously reported to the credit reporting agency.

94.     Upon information and belief, when IC System receives a consumer dispute through e-Oscar, it does not conduct a substantive review of any sort to determine whether the information already in its computer system is itself accurate.

95.     Because of IC System's violations of 15 U.S.C. § 1681s-2(b)(1)(A), Plaintiff suffered actual damages, including, without limitation, credit damage, damage to reputation, embarrassment, humiliation, and other emotional distress.

96.     IC System's conduct in violating § 1681s-2(b)(1)(A) was willful, rendering it liable to Plaintiff for punitive damages under 15 U.S.C. § 1681n. In the alternative, IC System was negligent, entitling Plaintiff to recover under 15 U.S.C. §1681o.

97.     Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from IC System under 15 U.S.C. §§ 1681n and 1681o.

**COUNT FIVE:**
**VIOLATION OF FCRA, 15 U.S.C. § 1681s-2(b)(1)(B)**
**(IC SYSTEM)**

98.     Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

99.     On one or more occasions within the past two years, by example only and without limitation, IC System violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the credit reporting agencies.

100.    As Plaintiff detailed in the previous Count, IC System has elected to use the e-Oscar system for its FCRA disputes received through the credit reporting agencies.

101.    When it received the ACDV forms from the credit reporting agencies, IC System did not review any of the information that Plaintiff included in the disputes, which demonstrated that IC System's reporting of the account was inaccurate.

102.    If IC System had reviewed this information, it would have known that its previous reporting was incorrected and needed to be updated.

103.    IC System also ignored the other information that the consumer reporting agencies provided on Plaintiff's disputes, including the two-digit dispute code that the agencies listed on the ACDV form.

104.    IC System knew the meaning of the dispute codes used by the consumer reporting agencies in e-Oscar.

105.    IC System does not contend that the ACDV system is an inadequate means to receive FCRA disputes through the credit reporting agencies.

106.    IC System understood Plaintiff's disputes and that Plaintiff claimed that the information was inaccurate.

107.    Despite this, IC System did not update its incorrect reporting regarding the PG&E account and continued to inaccurately attribute the account to Plaintiff.

108.    Because of IC System's violations of 15 U.S.C. § 1681s-2(b)(1)(B), Plaintiff suffered actual damages, including, without limitation, credit damage, damage to reputation, embarrassment, humiliation, and other emotional distress.

109.    IC System's violations of 15 U.S.C. § 1681s-2(b)(1)(B) were willful, rendering it liable for punitive damages under 15 U.S.C. § 1681n. In the alternative, IC System was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

110.     Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from IC System under 15 U.S.C. §§ 1681n and 1681o.

## COUNT SIX:
## VIOLATION OF FDCPA, 15 U.S.C. § 1692e
## (THE FURNISHER DEFENDANTS)

111.     Plaintiff incorporates the preceding allegations.

112.     The Furnisher Defendants violated the FDCPA, § 1692e, by using false, deceptive, or misleading representations or means in connection with the collection of any debt, including attempting to collect debts from Plaintiff that he did not owe.

113.     Specifically, at a minimum, the Furnisher Defendants violated 15 U.S.C. § 1692e(8) by communicating to at least Experian and Trans Union credit information which it knew or should have known was false, including by failing to report the debt as disputed after receiving Plaintiff's disputes.

114.     The Furnisher Defendants also violated § 1692e(2) by falsely representing the character, amount, or legal status of a debt, namely: representing that Plaintiff owes or owed the disputed debts.

115.     Plaintiff suffered actual damages because of the Furnisher Defendants' § 1692e violations, including a decreased credit score, the inability to obtain favorable credit, embarrassment, humiliation, and emotional distress.

116.     Plaintiff is entitled to recover actual damages, statutory damages, his reasonable attorneys' fees, and costs under 15 U.S.C. § 1692k.

WHEREFORE, Plaintiff demands judgment for actual, statutory, and punitive damages against Defendants as pleaded above; his attorneys' fees and costs; prejudgment and post-judgment interest at the judgment rate; and any other relief the Court finds appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,
**PLAINTIFF**

*/s/ Kristi C. Kelly*
Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
J. Patrick McNichol, VSB #92699
Matthew G. Rosendahl, VSB #  93738
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com
Email: matt@kellyguzzo.com

*Counsel for Plaintiff*